1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney
2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  KATHERINE LLOYD-LOVETT (CABN 276256)
   Assistant United States Attorney
5  ANDREW J. BRIGGS (CABN 294224)
   Special Assistant United States Attorney
6
        1301 Clay Street, Suite 340S
7       Oakland, California 94612
        Telephone: (510) 637-3680
8       FAX: (510) 637-3724
        katherine.lloyd-lovett@usdoj.gov
9       andrew.briggs@usdoj.gov

10  Attorneys for the United States

11              UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13                    OAKLAND DIVISION

14  UNITED STATES OF AMERICA,          )   Case No.   19 CR-00559 JST
                                       )
15          Plaintiff,                 )   UNITED STATES' SENTENCING
                                       )   MEMORANDUM
16      v.                             )
                                       )
17  UNIX LINE PTE, LTD.,               )
                                       )   Date: March 20, 2020
18          Defendant.                 )   Time: 9:30 a.m.
                                       )
19  _____  )

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2    I.      INTRODUCTION .................................................................................................1

3    II.     NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE
        DEFENDANT'S HISTORY AND CHARACTERISTICS.....................................1

4
            A.      UNIX Crew Members Knowingly Discharged Oily Bilge Water Overboard
5                    and Failed to Document the Discharges ...................................................1

6            B.      Defendant's Criminal History.................................................................5

7    III.    PENALTIES, SENTENCING GUIDELINES, AND PLEA AGREEMENT ................6

8            A.      Statutory Penalties .................................................................................6

9            B.      Sentencing Guidelines ............................................................................6

10           C.      Plea Agreement .......................................................................................7

11   IV.     LEGAL STANDARD ..........................................................................................7

12   V.      SENTENCING RECOMMENDATION ...................................................................8

13           A.      The Facts Support the Parties' Recommended Sentence...........................8

14           B.      Seriousness of the Offense, Promoting Respect for the Law, and Providing
                    Just Punishment for the Offense ............................................................11
15
            C.      Deterrence and Protection of the Public ................................................11
16
            D.      The Recommended Sentence is Consistent with Section 3572 and Chapter
17                   Eight of the Guidelines .........................................................................12

18   VI.     CONCLUSION..................................................................................................13

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF AUTHORITIES**

Cases

*United States v. Avin International, Ltd, et al.*, No. 18-CR-00118 (E.D. Tex.) .......................................10

*United States v. Bernhard Schulte Shipmanagement (Singapore) PTE LTD.*, No. 20-CR-00004 (D. Hawaii)..........................................................................................................................................8

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) ...............................................................7

*United States v. Chartworld Shipping Corporation, et al.*, No. 19-CR-00058 (D. Del.) ............................8

*United States v. d'Amico Shipping Italia S.p.A.*, No. 19-CR-00284 (D. N.J.)..................................... 9

*United States v. Fukuichi Gyogyo Kabushiki Kaisha*, No. 19-CR-00024 (D. Guam)..................................9

*United States v. Interorient Marine Services Limited, et al.*, No. 18-CR-00366 (W.D. La.) ....................10

*United States v. Unix Line PTE, Ltd. and Spring Navigation S.A.*, No. CR-02-6064 (W.D. Wash.)..........5

*United States v. Portline Bulk International S.A., et al.*, No. 19-CR-00434 (D. S.C.) ................................9

Statutes

18 U.S.C. § 1001 ..................................................................................................................... 5

18 U.S.C. § 1505 ................................................................................................................ 9, 10

18 U.S.C. § 1519 ....................................................................................................................... 9

18 U.S.C. § 3553(a) .............................................................................................................. ., 7

18 U.S.C. § 3553(a)(2) ........................................................................................................ 1, 7

18 U.S.C. § 3571 ..................................................................................................................... 6

18 U.S.C. § 3572 ..................................................................................................................... 7

18 U.S.C. §§ 3553 ............................................................................................................. 6, 10

33 U.S.C. § 1319(c)(1)(A) ..................................................................................................... 10

33 U.S.C. § 1321 .................................................................................................................... 5

33 U.S.C. § 1321(b)(5) .......................................................................................................... 10

33 U.S.C. § 1908(a) ........................................................................................................ *passim*

46 U.S.C. § 70036(b)(1) .......................................................................................................... 8

## I.      INTRODUCTION

On February 26, 2020, the defendant, Unix Line PTE, LTD. (hereafter, "UNIX"), a convicted felon, pleaded guilty to Count One of the captioned Superseding Information: Knowing Failure to Maintain an Oil Record Book, in violation of 33 U.S.C. § 1908(a).  Dkt. 45.  For the reasons set forth below, the government recommends the parties' agreed-upon sentence: a fine of $1,650,000; a $400 mandatory special assessment; four years' probation; and implementation of a comprehensive Environmental Compliance Plan (hereafter, "ECP") as a condition of probation.  A copy of the proposed ECP is submitted with this memorandum as Exhibit A.

As detailed below, the recommended sentence is consistent with similar cases across the United States and is "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).  The government therefore requests that the Court accept the parties' Plea Agreement under Federal Rule of Criminal Procedure 11(c)(1)(C) and sentence UNIX as jointly recommended by the parties.

## II.     NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE DEFENDANT'S HISTORY AND CHARACTERISTICS

### A.      UNIX Crew Members Knowingly Discharged Oily Bilge Water Overboard and Failed to Document the Discharges

UNIX is the operator of the Motor Tanker Zao Galaxy (hereafter, "Zao Galaxy"), a 16,408 gross-ton, ocean-going motor tanker, registered under the flag of the Marshall Islands.  Plea Agreement, Dkt. 43 ¶ 2.  On or about January 21, 2019, the Zao Galaxy set sail from the Philippines, heading towards Richmond, California, carrying a cargo of palm oil.  *Id.*  On or about February 11, 2019, the Zao Galaxy arrived in Richmond, California, in the Northern District of California, where it underwent a previously scheduled United States Coast Guard (hereafter, "Coast Guard") Port State Control inspection and Certificate of Compliance examination.[1]  *Id.*  While the Coast Guard inspection and examination were underway, a whistleblowing crew member of the Zao Galaxy handed one of the examiners a note:

---

[1] On February 4, 2019, agents of the Zao Galaxy requested that the vessel's annual Certificate of Compliance examination be performed while the ship would be moored in Richmond, California.  A typical Certificate of Compliance examination includes, among other things, inspection of the engine room, pollution prevention equipment, and the operation of the pollution prevention equipment.  A Certificate of Compliance is necessary to engage in commercial commerce in the United States.

As a result of this note, additional Coast Guard examiners responded to the Zao Galaxy to conduct an expanded examination, which included interviews of various crew members.  During the interviews, two whistleblowing crew members came forward.  One whistleblowing crew member showed Coast Guard examiners videos and photographs, taken on a cell phone, which appeared to show overboard discharges of oily bilge water from the Zao Galaxy's engine room through a configuration of drums, flexible hoses, and flanges.  The configuration depicted in the photographs and videos appeared to show oily bilge water being discharged overboard through the vessel's Soot Eductor, bypassing the Zao Galaxy's Oil Water Separator, which is a standard piece of pollution-prevention equipment used to treat oily water prior to discharge overboard.  The Oil Water Separator removes oil from an oily water mixture, such that only water is discharged into the ocean that is verified to contain less than 15 parts per million of oil to water.  By contrast and as its name suggests, the Soot Eductor is meant to discharge soot from the ship, not oily water.

Screenshots captured from the cell phone videos are depicted below.  The image on the left shows one of the drums used in the configuration.  The image in the middle shows the configuration's connection to the vessel's Soot Eductor, which are the greyish pipes in the lower half of the image.  The image on the right is a view into the Primary Bilge Tank, a tank where oily bilge water is stored, with a hose from the discharge configuration visible on the left side of the image.





One whistleblowing crew member led Coast Guard examiners to locations on the vessel where the drum containers, flexible hoses, and flanges that were used in the discharge arrangement were hidden.  One of the hoses had been hidden within a large pipe in a storage room, one drum container was hidden in the rope storage room, and one of the flanges had been hidden in a crew member's stateroom. Photographs of where the pieces of equipment had been hidden are depicted below.



With Coast Guard investigators present, crew members recreated the configuration of the equipment used to perform the overboard discharges.  A photograph of the recreation is depicted below.

The Primary Bilge Tank is the white tank on the right side of the image, and the Soot Eductor is on the bottom left side of the image.



The two whistleblowing crew members told the Coast Guard that they were ordered to perform the discharges by the Zao Galaxy's First Engineer, Gilbert Dela Cruz, to facilitate the emptying, cleaning, and re-painting of the vessel's Primary Bilge Tank, in anticipation of the upcoming Certificate of Compliance examination.  Dela Cruz reportedly ordered the crew members to perform the discharges when it was dark outside.  The two whistleblowing crew members also told the Coast Guard that they were ordered by Dela Cruz to paint different portions of the equipment used to perform the discharges to conceal their use from Coast Guard examiners.  In addition, crew members were unable to demonstrate proper operation of the Oil Water Separator for the Coast Guard on two separate occasions.

As part of the inspection, chemical samples were taken from various locations in the Zao Galaxy's engine room, including from the Primary Bilge Tank, the drum containers involved in the discharge arrangement, and the Soot Eductor overboard valve.  Analysis of a sample taken from the Soot Eductor overboard valve showed that it contained fuel and lubrication oils, which should not be present in any amount.

The Coast Guard inspection team reviewed the Zao Galaxy's Oil Record Book, which contained no entries documenting the discharges of oily bilge water through the above-described configuration. Dela Cruz, as First Engineer, was responsible for making entries in the Oil Record Book on the Zao Galaxy. Both the Captain and the Chief Engineer of the Zao Galaxy signed off on the inaccurate Oil Record Book entries. UNIX benefitted from the discharges by not incurring the financial costs associated with lawfully processing the oily bilge water through functioning pollution prevention equipment, like an Oil Water Separator, which require regular maintenance, or disposing the oily bilge water onshore, which requires paying a third party onshore disposal service. In addition, and perhaps more importantly, the cleaning of the Primary Bilge Tank was done in anticipation of the Certificate of Compliance inspection, the passage of which was critical for UNIX to continue using the Zao Galaxy in commercial cargo operations.

UNIX admitted that its crew members knowingly performed the discharges at the direction of a higher ranking ship's officer, while acting within the scope of their agency and employment, and for the intended benefit, at least in part, of UNIX. Dkt. 43 ¶ 2. UNIX further admitted that the discharges of oily bilge water were knowingly not recorded in the Zao Galaxy's Oil Record Book by Dela Cruz, who directed the discharges, and that the fraudulent Oil Record Book was presented to the Coast Guard during the Port State Control inspection and the Certificate of Compliance examination. *Id.* Finally, UNIX admitted that the failure to maintain an accurate Oil Record Book was done knowingly and for the benefit of UNIX. *Id.*

### B.    Defendant's Criminal History

This is not UNIX's first criminal offense. UNIX was convicted, pursuant to a guilty plea, in 2003 in the Western District of Washington of a felony violation of 18 U.S.C. § 1001 (False Statements) and a misdemeanor violation of 33 U.S.C. § 1321 (Clean Water Act) in connection with the unlawful discharge of oily bilge water and false Oil Record Book entries. *See United States v. Unix Line PTE, Ltd. and Spring Navigation S.A.*, No. CR-02-6064 (W.D. Wash.). In the plea agreement, UNIX, among other things, admitted that the Chief Engineer of one of its vessels "directed other engine crew members to fabricate a flexible hose for the purpose of bypassing the Oil Water Separator and discharging untreated waste oil directly overboard." Dkt. 13 at 10. UNIX further admitted that "[n]one of the

discharges that occurred through the flexible hose were recorded in the [Oil Record Book]" and "UNIX by and through the actions of the vessel's crew, is vicariously deemed to have knowingly made false entries in the [Oil Record Book] in an effort to conceal the fact that oily waste had been discharged directly overboard." Dkt. 13 at 11.  UNIX was sentenced to four years' probation, a $550,000 fine, a $425 special assessment, and implementation of a comprehensive ECP as a condition of probation.  Dkt. 34.

## III.    PENALTIES, SENTENCING GUIDELINES, AND PLEA AGREEMENT

### A.    Statutory Penalties

The maximum statutory penalties for a violation of 33 U.S.C. § 1908(a), the Act to Prevent Pollution from Ships, are as follows: $500,000 fine or twice the gross gain or gross loss, whichever is greater; five years of probation; a $400 special assessment; and potential forfeiture.

The parties agree that UNIX gained, as a result of the conduct alleged in Count One of the Superseding Indictment, at least $825,000, all of which constitutes gain pursuant to the Alternative Fines Act, 18 U.S.C. § 3571.  Accordingly, the maximum fine of twice the gross gain to UNIX is $1.65 million.

### B.    Sentencing Guidelines

The Guidelines section applicable to the offense is Section 2Q1.3 – Mishandling of Other Environmental Pollutants; Recordkeeping, Tampering, and Falsification.  Chapter Eight of the Guidelines provides guidance for sentencing organizational defendants.  However, Sections 8C2.2 through 8C2.9 of Chapter Eight, which relate to the determination of corporate fines, do not apply to environmental offenses which fall under Chapter Two, Part Q of the Guidelines.  *See* U.S.S.G. § 8C2.1, Applicability of Fine Guidelines.  Instead, the Background Section of 8C2.1 instructs that the fine for an environmental offense committed by an organizational defendant should be determined pursuant to Section 8C2.10, Determining the Fine for Other Counts.  Section 8C2.10 instructs the court to determine an appropriate fine amount by applying the provisions of 18 U.S.C. §§ 3553 and 3572.

Sections 8D1.1 through 8D1.4 provide guidance regarding the imposition of a probationary sentence for organizational defendants, including the length of probation, and mandatory and recommended conditions of probation.  The Guidelines instruct that the court shall order a term of

1  probation "if such sentence is necessary to ensure that changes are made within the organization to

2  reduce the likelihood of future criminal conduct." U.S.S.G. § 8D1.1(a)(6). Further, when a sentence of

3  probation is imposed in a felony case, "the term of probation shall be at least one year but not more than

4  five years." U.S.S.G. § 8D1.2(a)(2). And finally, U.S.S.G. §§ 8D1.3 and 8D1.4 address appropriate

5  conditions of probation, including that the development of an effective compliance and ethics program,

6  consistent with Section 8B2.1, may be appropriate if it is reasonably related to the nature and

7  circumstances of the offense or the history and characteristics of the defendant.

8  **C.    Plea Agreement**

9  The parties have entered into a Plea Agreement regarding the disposition of this case under

10  Federal Rule of Criminal Procedure 11(c)(1)(C). The Plea Agreement provides that the parties agree

11  that a reasonable and appropriate disposition of the case is: a fine of $1,650,000; a $400 mandatory

12  special assessment; four years' probation; and implementation of a comprehensive ECP as a condition of

13  probation. Dkt. 43 ¶ 8.

14  **IV.    LEGAL STANDARD**

15  Under Ninth Circuit case law, the Court should impose a sentence sufficient, but not greater than

16  necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2).

17  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of

18  determining an appropriate sentence by calculating the correct sentencing range under the Guidelines.

19  *Id.* After determining the appropriate Guidelines calculations, the Court should then evaluate the

20  sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Id.* at 991–93.

21  The Court is also required to consider the factors in 18 U.S.C. § 3572, which governs the

22  imposition of a fine. The factors identified in Section 3572 include: (1) the defendant's income, earning

23  capacity, and financial resources; (5) the need to deprive the defendant of illegally obtained gains from

24  the offense; and (8) the size of the organization and any measure taken by the organization to discipline

25  any officer, director, employee or agent of the organization responsible for the offense and to prevent a

26  recurrence of such an offense.

27  //

28  //

V.    **SENTENCING RECOMMENDATION**

 A.    **The Facts Support the Parties' Recommended Sentence**

 The parties' agreed-upon sentence accounts for the seriousness of the current offense, the damage caused to the environment, the various efforts taken to cover up the conduct, and UNIX's criminal history.  The offense at issue is both an environmental and an economic crime.  Accordingly, an economic penalty is warranted, sufficient to punish UNIX and to deter other companies from committing similar offenses.

 The parties' agreed-upon sentence is also consistent with other sentences imposed on similarly-situated corporate defendants over the past several years, as summarized below.

*United States v. Bernhard Schulte Shipmanagement (Singapore) PTE LTD.*, No. 20-CR-00004 (D. Hawaii)

   Conviction: 33 U.S.C. § 1908(a) (Knowing Failure to Maintain an Oil Record Book)

   Sentence: $1.75M fine, $400 special assessment, four years' probation, and ECP

   Facts: According to the plea agreement (Dkt. 18), crew member cell phone video showed a pneumatic pump and hose system used on a vessel to transfer bilge waste to the Clean Drain Tank and then overboard, without being processed through the vessel's pollution prevention equipment.  The transfer and discharge of the bilge waste was not recorded in the vessel's Oil Record Book, and there was evidence that the vessel's Chief Engineer had destroyed sounding sheets and altered a copy of the vessel's electronic sounding log to cover-up the discharges.

*United States v. Chartworld Shipping Corporation, et al.*, No. 19-CR-00058 (D. Del.)

   Conviction: 33 U.S.C. § 1908(a) (Knowing Failure to Maintain an Oil Record Book); 46 U.S.C. § 70036(b)(1) (Failure to Notify of Hazardous Condition)

   Sentence: $1.8M fine (split between two corporate defendants), $800 special assessment ($400 per count), four years' probation, and ECP

   Facts: According to the plea agreements (Dkt. 135, 136), crew members of Chartworld Shipping Corporation and Nederland Shipping Corporation failed to notify the United States Coast Guard that a hazardous condition existed on the vessel, namely a hull breach below the

water line.  Crew members also failed to record in the vessel's Oil Record Book, the transfer

and eventual overboard discharge of oily bilge water between the vessel's Bilge Holding

Tank and Aft Peak Ballast Tank.

*United States v. d'Amico Shipping Italia S.p.A.*, No. 19-CR-00284 (D. N.J.)

Conviction: 33 U.S.C. § 1908(a) (Knowing Failure to Maintain an Oil Record Book)

Sentence: $3.0M fine, $400 special assessment, four years' probation, and ECP

Facts: According to the plea agreement (Dkt. 5), two different Chief Engineers of the vessel

ordered the transfer of oily bilge water to the Sewage Holding Tank and the subsequent

discharge of that tank.  The transfers and discharges occurred regularly for approximately

five months.  The transfers and discharges were not recorded in the Oil Record Book.

Instead, one of the Chief Engineers falsified the Oil Record Book to state that the oily bilge

water had been processed through the vessel's Oil Water Separator.  That same Chief

Engineer lied to the Coast Guard and destroyed evidence.

*United States v. Portline Bulk International S.A., et al.*, No. 19-CR-00434 (D. S.C.)

Conviction: 18 U.S.C. § 1519 (Obstruction of Justice – False Document); 33 U.S.C. §

1908(a) (Knowing Failure to Maintain an Oil Record Book)

Sentence: $1.5M fine, $800 special assessment, four years' probation, and ECP

Facts: According to the plea agreement (Dkt. 6), senior members of the Engine Department

ordered crew members to perform ongoing, illegal bypasses of the vessel's Oil Water

Separator, using a "magic pipe."  There were at least 40 bypasses and overboard discharges

over approximately 16 months; none of the bypasses or discharges were recorded in the Oil

Record Book.  The equipment used to perform the bypasses and overboard discharges would

remain connected while the vessel was underway and would be disconnected and hidden

when the vessel entered port.

*United States v. Fukuichi Gyogyo Kabushiki Kaisha*, No. 19-CR-00024 (D. Guam)

Conviction: 18 U.S.C. § 1505 (Obstruction of Justice); 33 U.S.C. § 1908(a) (Knowing

Failure to Maintain an Oil Record Book)

Sentence: $1.5M fine, $400 special assessment, five years' probation and ECP

**Facts**: According to the plea agreement (Dkt. 3), the Chief Engineer admitted that he had discharged oily bilge water and oil waste directly overboard, without the use of appropriate pollution prevention equipment, through the emergency bilge pump system and the use of buckets.  The Chief Engineer admitted that this was a long-standing practice on the vessel.  The vessel's Oil Record Book did not document the overboard discharges.  Crew members revealed that garbage, including animal carcasses, fishing gear, and plastics were also thrown overboard.

*United States v. Avin International, Ltd, et al.*, No. 18-CR-00118 (E.D. Tex.)

**Conviction**: 18 U.S.C. § 1505 (Obstruction of Justice); 33 U.S.C. § 1321(b)(5) (Failure to Report Discharge of Oil); 33 U.S.C. § 1319(c)(1)(A) (Negligent Discharge of Oils)

**Sentence**: $4.0M fine (between two defendants), $1,175 special assessment (between two defendants), four years' probation, and ECP

**Facts**: According to the separately-filed factual basis of the plea agreement (Dkt. 8), while at port, the vessel discharged oil from its ballast system into the water, creating a visible sheen in the water around the vessel.  This continued until the vessel came into another port.  The oil discharges were not recorded in the vessel's Oil Record Book.  The Chief Officer of the vessel was interviewed twice about the oil discharges and lied to Coast Guard investigators both times.

*United States v. Interorient Marine Services Limited, et al.*, No. 18-CR-00366 (W.D. La.)

**Conviction**: 33 U.S.C. § 1908(a) (Knowing Failure to Maintain an Oil Record Book)

**Sentence**: $2.0M fine, $400 special assessment, four years' probation, and ECP

**Facts**: According to the factual basis of the plea agreement (Dkt. 13-3), the Chief Officer of the vessel ordered that a fresh water hose be connected to the vessel's oil discharge monitoring equipment to facilitate the overboard discharge of oil cargo residue and machinery space bilge water from the Port Slop Tank.  The fresh water hose was connected and used to discharge machinery space bilge water from the Port Slop Tank.  The discharges were not recorded in the Oil Record Book.

//

UNITED STATES' SENTENCING MEMO.
19 CR-00559 JST                                10

**B.      Seriousness of the Offense, Promoting Respect for the Law, and Providing Just Punishment for the Offense**

The recommended sentence is consistent with the requirement in 18 U.S.C. § 3553 to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment."  While neither the exact location of the discharges nor the amount of oily bilge water discharged are currently known, UNIX's conduct is egregious, particularly when viewed in light of its prior conviction.  UNIX crew members' efforts, at the direction of a high-ranking UNIX officer, to discharge oily bilge water and then conceal their criminal activity demonstrate UNIX's failure, at an organization level, to deter misconduct.  UNIX crew members went through great lengths to cover up their criminal activity, including discharging the oily bilge water only at night, hiding the discharge equipment in different, far-reaching locations on the vessel, painting pieces of equipment to conceal their use, and failing to record the discharges in the vessel's Oil Record Book.  Such a serious offense merits a serious sentence; a fine of $1,650,000, a $400 mandatory special assessment, four years' probation, and implementation of a comprehensive ECP as a condition of probation is such a sentence.  In short, the recommended sentence is a just and fair one.

**C.      Deterrence and Protection of the Public**

The recommended sentence is also appropriate in light of the Court's interest in deterrence.  In 2003, UNIX was sentenced to a $500,000 fine, four years' probation, and implementation of an ECP as a condition of probation.  A sentence of a $1.65 million fine, four years' probation, and implementation of a comprehensive, more rigorous ECP would be consistent with the more serious recidivist nature of the offense at hand and will hopefully deter UNIX from further similar conduct.

This recurrence of similar misconduct creates doubt regarding whether UNIX took reasonable steps to meet the requirements of its prior ECP.  Accordingly, the proposed ECP here is more stringent and robust than the 2003 ECP, in that it, among other things, (1) applies to more than twice the number of vessels (33): (2) requires Chief Engineers of all subject vessels to measure, monitor, and manage ship-generated wastes daily; (3) requires selection and appointment of a Court Appointed Monitor; and (4) requires all subject vessels to have numbered seals on all piping typically used to illegally discharge oily bilge water.  In short, the proposed ECP is comprehensive, wide-ranging, and provides for multiple

1    layers of environmental oversight at all levels within the company, from the board room to individual

2    crew members, including for all 33 of UNIX's vessels that will come to the United States during the

3    four year term of probation.

4    Further, the recommended sentence will also serve to protect the public and the environment

5    from UNIX's behavior. The dumping of oil into our oceans, in any amount, is detrimental to the

6    environment and the public. Imposing a significant financial sanction and requiring UNIX to abide by a

7    robust ECP will deter UNIX from further similar conduct and protect the public and the environment. It

8    will also send a message to other similarly-situated companies that such conduct is not tolerated and will

9    be vigorously prosecuted.

10       **D.    The Recommended Sentence is Consistent with Section 3572 and Chapter Eight of
             the Guidelines**

11

12    The recommended sentence of a $1.65 million fine and four years' probation is also consistent

13    with the factors and requirements of Section 3572 and Chapter Eight of the Guidelines. UNIX's

14    income, earning capacity, financial resources, and ability to pay the recommended $1.65 million fine are

15    demonstrated by the $1.5 million bond that UNIX posted with the Coast Guard in February 2019, which

16    allowed the Zao Galaxy to leave Richmond, California, despite the ongoing federal investigation into

17    UNIX crew members' conduct aboard that ship. UNIX's solvency is also demonstrated by the large

18    fleet of international vessels that are managed by UNIX – at least 33 different UNIX vessels will have

19    ports of call in the United States in the next four years. Further, the parties agree that UNIX gained at

20    least $825,000 as a result of the illegal conduct alleged, and a fine of $1.65 million would serve to

21    deprive UNIX of illegally obtained gains from the illegal conduct. Finally, it is unclear what, if any,

22    measures UNIX has taken to discipline any officer, director, employee or agent of the organization

23    responsible for the offense and to prevent a recurrence of such an offense; however, the recommended

24    sentence, including the proposed ECP, will require UNIX to work towards prevention of recurrence of

25    such an offense. Given UNIX's recidivist history, a probationary sentence is "necessary to ensure that

26    changes are made within the organization to reduce the likelihood of future criminal conduct" (U.S.S.G.

27    § 8D1.1(a)(6)) and will help to accomplish one or more of the purposes of sentencing set forth in

28    Section 3553(a)(2), namely, deterrence and protection of the public.

1   **VI.    CONCLUSION**

2           The parties' agreed-upon sentence reflects the seriousness of the offense, UNIX's criminal

3   history, the need to promote respect for the law, the need to deter UNIX from similar conduct, and the

4   need to protect the public from further wanton behavior by UNIX.  Accordingly, a sentence of a fine of

5   $1,650,000, a $400 mandatory special assessment, four years' probation, and implementation of a

6   comprehensive ECP as a condition of probation, is the just and fair one.

7   DATED:  March 13, 2020                    Respectfully submitted,

8                                             DAVID L. ANDERSON
                                              United States Attorney
9

10                      _____/s/_____

11                                            KATHERINE LLOYD-LOVETT
                                              Assistant United States Attorney
                                              ANDREW J. BRIGGS
12                                            Special Assistant United States Attorney

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTACHMENT A**
**Environmental Management System/Compliance Plan**

*United States v. Unix Line PTE, Ltd., et al.*

The following standards and requirements for an ENVIRONMENTAL COMPLIANCE PROGRAM (hereafter "ECP") have been prepared for defendant **Unix Line PTE, Ltd.** (hereafter "**UNIX LINE**") by the United States (hereafter "Government") filed in the United States District Court for the Northern District of California. Compliance with all of the standards and requirements of the ECP is a special condition of probation.

The ECP includes various provisions to ensure that all vessels technically managed by **UNIX LINE, which call or may call at ports or places in the United States,** comply with all maritime environmental requirements established under applicable international, flag state and port state law, including, but not limited to the International Convention for the Safety of Life at Sea (SOLAS), the International Safety Management (ISM) Code, the International Convention for Prevention of Pollution from Ships (MARPOL) and all applicable Federal and state statutes and regulations including, but not limited to, the Ports and Waterways Safety Act (PWSA), the Act to Prevent Pollution from Ships (APPS), the Clean Water Act (CWA), and the Oil Pollution Act (OPA), and with the requirements of this ECP. The auditing requirements of this ECP apply to all vessels that are technically managed by **UNIX LINE** and that are expected to trade in the United States during the pendency of probation. As more fully set forth below, this ECP and its requirements will also apply to vessels that **UNIX LINE** assumes technical management of during the period of probation. The vessels technically managed by **UNIX LINE** that will call in the United States during the period of probation (hereafter "Covered Vessels") as of the execution of this ECP are:

1. GINGA SAKER
2. GINGA TIGER
3. GINGA LION
4. ELM GALAXY
5. GINGA COUGAR
6. GINGA PUMA
7. AZALEA GALAXY
8. GINGA PANTHER
9. GINGA CHEETAH
10. GINGA LYNX
11. GINGA CARACAL
12. GINGA BOBCAT
13. ARGENT ASTER
14. ARGENT GERBERA
15. ARGENT IRIS
16. ARGENT HIBISCUS
17. FUJI GALAXY
18. AMAGI GALAXY
19. KAIMON GALAXY
20. ZAO GALAXY
21. GINGA OCELOT

22. ARGENT SUNRISE
23. ARPEGGIO
24. ENSEMBLE
25. MENUETT
26. BRILLANTE
27. DIVA
28. GALLOP
29. HARMONICS
30. JAZZ
31. HODAKA GALAXY
32. NAEBA GALAXY
33. HAKONE GALAXY

## A.   APPLICABILITY/PURPOSE

(1)   This ECP shall cover and apply to all of **UNIX LINE** operations, including all subsidiaries, , and agents (owned wholly or partially by **UNIX LINE**), involved in the technical management of seagoing vessels calling at United States ports which are technically managed by **UNIX LINE**, on the date of sentencing or at any time during the period of probation. It shall also include all persons and agents working on behalf of **UNIX LINE**, its subsidiaries, agents, and any other individuals or organizations to the extent they provide services in support of the technical management of the aforesaid seagoing vessels (including operation, maintenance and repair) as direct employees or independent contractors on the date of sentencing or at any time during the period of probation.

(2)   The ECP is not intended to replace the ISM Code, or any other applicable international legal requirement or United States statute and regulation. The purpose of this ECP is to augment the requirements of existing law by increasing and improving inspections, reviews, and audits of **UNIX LINE** technically managed vessels, shoreside facilities, and operations involving said vessels; increase training of all of **UNIX LINE** personnel involved with said vessels; develop and implement management and engineering controls to better manage, detect and prevent environmental violations; and require periodic reports to the United States Probation Office for the Northern District of California, the United States Attorney's Office for the Northern District of California, the Environmental Crimes Section of the United States Department of Justice, and the United States Coast Guard (collectively hereafter "the United States") to ensure that **UNIX LINE** is following the requirements of this ECP and that all of its technically managed vessels comply with all maritime environmental requirements established under applicable international, flag state, and port state law and all applicable Federal and state statutes and regulations, and that an effective environmental management system is in place to prevent recurrence of violations.

## B.   CORPORATE COMPLIANCE MANAGER

(1)   Within thirty (30) days of sentencing, **UNIX LINE** shall designate a senior corporate officer as Corporate Compliance Manager (hereafter "CCM") who shall report directly to the President and/or Managing Director of **UNIX LINE**. **UNIX LINE** shall provide the name of the CCM to the United States. The CCM could be the same individual as **UNIX LINE**'s "designated person" under the ISM Code unless reasons are provided to the United States justifying why the "designated person" should not also be the CCM. The CCM shall be responsible for coordinating with the Independent ECP Consultant (hereafter "IC"), as more fully described below, developing and implementing all of the

procedures and systems required herein, establishing and implementing training programs for the officers and crew of **UNIX LINE** technically managed vessels, ensuring that reviews, audits and surveys are carried out as required and ensuring that all documents are properly maintained and that reports are made on a timely basis to the United States. All reports required under this ECP shall be signed by the CCM acknowledging his receipt and review of same.

(2)     **UNIX LINE** shall establish a procedure and reporting system that requires and enables all officers, crewmembers and employees, and shoreside personnel involved in the manning and/or operation of **UNIX LINE**'s seagoing vessels subject to this ECP, including all persons working for **UNIX LINE**, its subsidiaries, and agents of **UNIX LINE** as either direct employees or independent contractors, to the extent they are providing services relating to the technical management of said vessels, including manning and/or operation, to notify the CCM of all violations of any applicable environmental requirements or other requirements of this ECP and to cooperate fully with the IC and the United States in carrying out their reviewing, auditing and oversight functions required by applicable law and this ECP. **UNIX LINE** agrees to establish a procedure that makes failure to notify the CCM of any violations of any applicable environmental requirements and failure to cooperate fully with the IC and the United States in carrying out their auditing and oversight functions required by applicable law and this ECP, grounds for dismissal. **UNIX LINE** agrees not to retaliate against any officer, crewmember, employee, or shoreside personnel involved in the manning and/or operation of the aforesaid **UNIX LINE** technically managed seagoing vessels, including all persons working for **UNIX LINE**, its subsidiaries, and agents of **UNIX LINE** as either direct employees or independent contractors or entity making any such report.

(3)     The CCM shall be authorized to access all records and personnel regarding all vessels subject to the ECP for the purpose of ensuring compliance with the ECP. The CCM shall be authorized to implement all requirements of the ECP on all vessels subject to the ECP. The CCM shall ensure that audits and surveys are carried out as required, that all documents are properly maintained and that reports are made on a timely basis to the U.S. Probation Office, IC, the designated representative of the Coast Guard, and **UNIX LINE**. The CCM position will be filled by an individual(s) with significant maritime vessel operational background, who possesses auditing experience and is thoroughly familiar with the requirements of this ECP, and is knowledgeable about domestic and international maritime environmental laws and regulations.

(4)     CCM Responsibilities:

(a)     Development and Maintenance of Effective Training Programs

-     To the extent not already completed, the CCM will be responsible for developing training programs to educate and train **UNIX LINE** employees of their environmental commitment, the requirements of the ECP, the policies and procedures for complying with the ECP, and the possible consequences to **UNIX LINE** and to individuals for failure to comply with environmental laws.

-     Provide environmental consultants and contractors of **UNIX LINE** with documents and training to make them aware of the ECP.

(b)     Auditing and Compliance Assessment

-     Ensure that the IC conducts the review and audits required by the ECP and that the required

3

reports are prepared.

(c)     Fleet Reviews

- Supervise annual overall reviews of the ECP and "focused" reviews of key environmental areas to promote the adoption of "best practices."

(d)     Reporting of Non-Compliance by Employees and Crew Members

- Establish a means by which employees may report (anonymously, if the employee so desires) issues of non-compliance with this ECP and any other procedure, policy, or regulation associated with environmental protection.

## C.     MASTER AND CHIEF ENGINEER

(1)     The Master of each **UNIX LINE** vessel subject to this ECP, with the assistance of the CCM, shall ensure that prompt reports are made to the United States Coast Guard of any non-compliant condition of any such **UNIX LINE** vessel.

(2)     The Chief Engineer on board all vessels subject to this ECP shall perform the following duties regarding this ECP:

- Measure, monitor and manage shipboard generated wastes daily;

- Report to the CCM and cooperate with **UNIX LINE** to resolve environmental concerns, such as inoperative or ineffective pollution prevention equipment and document all efforts to do so in a log that is available for review and audit at all times.

## D.     INDEPENDENT ECP CONSULTANT AND ENVIRONMENTAL AUDITS

(1)     No later than thirty (30) days following the District Court's final imposition of sentence in *United States v. Unix Line PTE, Ltd., et al.*, **UNIX LINE** shall nominate three candidates for the IC that meet the qualifications below to conduct an Initial Environmental Review, and a Report of Findings for all of **UNIX LINE** operations as defined below. The United States will notify **UNIX LINE** in writing of which IC is acceptable. If none of the proposed candidates are acceptable, **UNIX LINE** will supply an additional candidate.  The United States' acceptance shall not be unreasonably withheld.

(2)     Qualified candidates for the IC position must have expertise and competence in the regulatory programs under U.S. and international environmental laws, and have expertise and competence in waste stream evaluation, monitoring and control technologies, with a primary emphasis on engine room and machinery space operations, used by **UNIX LINE** to achieve and maintain compliance in respect to **UNIX LINE** seagoing vessels. The IC shall also have sufficient expertise and competence to assess whether **UNIX LINE** has an adequate Environmental Management System in place to assess regulatory and ECP compliance, to correct non-compliance, and to prevent future non-compliance. **UNIX LINE** and the United States acknowledge that the functions of the IC may, by mutual agreement, be fulfilled by one or more individuals.

(3)     The IC must not directly own any stock in **UNIX LINE**, any of its subsidiaries, affiliated business entities (owned wholly or partially by **UNIX LINE**) or any agents of **UNIX LINE**, and must have no other direct financial stake in the outcome of duties conducted pursuant to this ECP. The IC must be

4

capable of exercising the same independent judgment and discipline that a certified public accounting firm would be expected to exercise in auditing a publicly held corporation. If **UNIX LINE** has any other contractual relationship with the IC, both **UNIX LINE** and the IC shall disclose to the United States such past or existing contractual relationships.

(4)     If the United States determines that the proposed IC does not reasonably meet the qualifications set forth in the previous paragraphs, or that past or existing relationships with the IC would affect the IC's ability to exercise the independent judgment and discipline required to conduct the ECP review and evaluation, such IC shall be disapproved and another IC shall be proposed by **UNIX LINE** within thirty (30) days of **UNIX LINE**'s receipt of the United States' disapproval.

(5)     During the first year of probation, the IC shall conduct an Initial Environmental Review of UNIX LINE's operations (vessel and shoreside) and **UNIX LINE**'s Covered Vessels. During the four year term of probation, all of the Covered Vessels shall be audited once, to include the Final Audit. The IC shall audit 25% of the Covered Vessels during the first year of probation, and an additional 25% of different Covered Vessels during the second year of probation. During the third year of probation, qualified **UNIX LINE** engineering personnel shall conduct audits of 25% of different Covered Vessels, and not the office, in accordance with the same standards and procedures utilized by the IC during the first two years of probation. Audit Reports prepared by UNIX LINE engineering personnel following their audit of 25% of different Covered Vessels shall be provided to the IC. The IC may request additional information concerning those audits as the IC may deem necessary, and if the IC determines that any of the audits conducted by UNIX LINE engineering personnel do not meet the requirements of this ECP, the IC may conduct audits of any of those vessels.

Two (2) of the audits, per annum, as described in this section, shall be performed while the vessels are underway and operating on voyages of short duration (3-4 days or less). **UNIX LINE** and the IC shall coordinate the underway audits to accommodate, as much as practicable, the vessels' operations and schedules. The remaining 25% of Covered Vessels that are not audited may be reserved for final year audits to be conducted by the CAM/TPA as described in this ECP. If the IC discovers any significant deficiencies or major non-conformities during an audit conducted pursuant to this section, the IC may conduct a follow-up audit to verify that the deficiency or major non-conformity has been rectified.

(6)     The Initial Environmental Review will exceed a typical SMS audit in scope and will be used to determine practices, procedures and equipment conditions not typically documented during a routine inspection by the classification society, port or flag state. The results of the Initial Environmental Review will be used to shape and revise the Environmental Management System established by this ECP.

(7)     The Initial Environmental Review shall meet the following specific requirements:

(a)     It shall assess all waste streams developed from any system, equipment and components found in each machinery space on board **UNIX LINE** vessels. This will include observation and documentation describing the leakages apparent on each system that can contribute to bilge loading. The audit will determine the status and quantify leakages stemming from:

(i)     all pump and valve seals and glands during operation,

(ii)    all piping systems, flanges, gaskets, fittings and joints,

(iii)   all equipment casings such as main and auxiliary engines, and reduction gears,

(iv)   operation of engines, boilers, incinerators, and evaporators, and

(v)   all other mechanical components found aboard **UNIX LINE** vessels.

(b)   It shall assess the adequacy and performance of the Oil Water Separator (OWS) and Incinerator, Sewage System, and any other pollution prevention equipment to handle the quantities and types of wastes developed during normal operations. To assess the performance of the OWS, the auditor shall conduct an operational test using the normal tank or bilge well supply as would be used in normal operations. The supply tank or bilge well must not be diluted. It will include an evaluation of the capacities for all tanks or containers associated with the management of sludges, bilges and oily wastes or other Wastes. It will include an evaluation of documentation tracking, maintenance and repair, and modifications of all pollution prevention equipment, and notification of equipment failure to the CCM or other shoreside personnel.

(c)   It shall assess each vessel's crew and their current workloads relating to all work performed on the vessel's systems, equipment and components, in an effort to ascertain that even the least significant leakages contributing to waste streams are remedied in a prompt and effective manner.

(d)   It shall assess the adequacy of the policy, procedures, current practices and equipment, including storage capabilities used to manage shipboard solid wastes generated in all areas of the vessel and the effectiveness of garbage management plans.

(e)   It shall assess the adequacy of the policy, procedures, current practices and equipment associated with cargo management developed during all evolutions of cargo operations.

(f)   It shall assess the ability of each vessel's crewmembers to create, devise or implement an unauthorized process to dispose of a shipboard waste including regular garbage, machinery space and cargo-generated wastes.

(g)   It shall assess the adequacy of each vessel's responsible crewmembers to maintain the following records and shall include a complete comparative analysis (against each other where possible) of the following records:

(i)   Oil Record Book,

(ii)   Engine room alarms,

(iii)   Tank sounding logs (if vessel not so equipped, then it must start maintaining such a log),

(iv)   Personal work records and lists,

(v)   Maintenance records,

(vi)   Vendor service records,

(vii)   Bilge waste and sludge receipts,

(viii)   Deck Log,

(ix)   Garbage Record Book,

      (x)     Wastewater Discharge Log,
      (xi)    Oil to Sea Equipment Interface Logs,
      (xii)   Hazardous waste manifests,
      (xiii)  Solid waste discharge receipts,
      (xiv)  Oil Content Monitor calibration logs,
      (xv)   Training records,
      (xvi)  Vetting documents,
      (xvii) Inspection documents, and
      (xviii) SMS or SQE Audit documents

(h)     It shall assess the adequacy of the policy, procedures, and current practices used to store and dispose of:

      (i)      Solvents,
      (ii)     Degreasers,
      (iii)    Cleaning wastes,
      (iv)    Batteries,
      (v)     Paints,
      (vi)    Oily rags,
      (vii)   Fluorescent and incandescent bulbs,
      (viii) Expired boiler and engine chemicals,
      (ix)    Used boiler and engine chemicals,
      (x)     Galley greases,
      (xi)    Pyrotechnics,
      (xii)   Medical supplies,
      (xiii)  Contaminates fuels,
      (xiv)  Used oil and greases,
      (xv)   Incinerator ash.
      (xvi)  Transformer oils,
      (xvii) Contaminated refrigerants, and
      (xviii) Hazardous materials.

(i)     It shall assess and evaluate documentation containing the certifications that each vessel's officers understand the requirements of this ECP and shall require signed statements by all vessel officers attesting that they understand false entries in the Oil Record Book for machinery space operations is a violation of law.

(j)     It shall assess the policy, procedures, and current practices associated with the Master's and Chief Engineer's capability to communicate with shoreside personnel, including the CCM and designated persons, and shall review such communications.

(k)     It shall assess the frequency and adequacy of, through interviews of crewmembers, shipboard pollution prevention and environmental protection meetings and training.

(l)     It shall assess the policy, procedures, and current practices used on vessels and ashore to track

crewmember environmental training, as well as the availability of and access to training resources.

(m)   It shall assess the adequacy of existing methods for employees to report environmental concerns and evaluate the capability of a reporting individual to remain anonymous, and review processes of handling environmental complaints from crewmembers and shoreside personnel.

(n)   It shall assess the policy, procedures, and current practices to ensure that vessel vendors, technicians, and other non-crewmembers follow **UNIX LINE** requirements regarding pollution prevention and environmental protection.

(o)   It shall assess the policy, procedures, and current practices used to manage the existing seal tracking and valve locking program, including the storage of seals and preventing the use of duplicate seals.

(p)   It shall assess the policy, procedures, current practices, and equipment used to maintain refrigeration units, including availability and status of refrigerant recovery units, procedures for recovering refrigerants, and maintenance of a leak log.

(q)   It shall assess the policy, procedures, current practices, and equipment related to Oil Transfer Procedures, including slops discharges, conditions of hoses, connections and transfer equipment, and shall include reviews of declarations of inspections.

(r)   It shall assess the policy, procedures, current practices, and equipment used to handle emergency releases of hazardous fluids or pollutants on deck or within machinery spaces of vessels, including a review of the Shipboard Oil Pollution Emergency Plan and evaluation of personnel performing such duties.

(s)   It shall assess the policy, procedures, and current practices associated with ballast water management and invasive species requirements.

(t)   It shall include an online or paper written survey of all fleet engineers at all levels for information on how to make the OWS, OCM, associated systems and waste management processes tamperproof and for methods on reducing or handling waste accumulations within machinery spaces. Participation shall be mandatory for all engineering personnel. The survey shall request the opinions of the vessels' engineers into their ability to adequately maintain the vessel systems, equipment and components. The survey will emphasize non-retaliation for open and honest opinions and reports of current noncompliant circumstances. The responses will be maintained in original format and made available to the IC. The original survey responses shall be included in the Report of Findings.

(8)   At the conclusion of the Initial Environmental Review, but in no event later than twelve (12) months

8

following the appointment date of the IC, the IC shall prepare a Report of Findings. If the IC believes that additional time is needed to analyze available information, or to gather additional information, or to complete the Report of Findings, **UNIX LINE** may request that the Government grant the IC such additional time, as required, which request shall not be unreasonably denied. If necessary, the Government may grant additional time in thirty (30) day increments for completion of the Report of Findings. The Report of Findings shall be provided to **UNIX LINE** and the United States. Based on the Report of Findings, **UNIX LINE** shall develop an Environmental Management System and Manual as described below. The IC shall conduct a second audit using the above criteria during the second year of probation (as per Sec. D (5) above) in order to ascertain if **UNIX LINE** has continued to implement the EMS system and whether the vessels are in compliance with environmental requirements.

**E.     ENVIRONMENTAL MANAGEMENT SYSTEM**

(1)     The CCM shall be responsible for establishing an Environmental Management System (EMS). To the extent possible, the EMS shall be based upon the ISO 14001 / 2015 standards. The EMS shall include the following core requirements:

(2)     Environmental Policy:

The EMS should be based upon a documented and clearly communicated policy. This policy should set out **UNIX LINE'S** commitment towards a cleaner marine environment. It should include:

    (a)     provision for compliance with environmental requirements;

    (b)     commitment to continuous improvement in environmental performance, including those areas required by this ECP;

    (c)     commitment to pollution prevention that emphasizes source reduction, to include funding and human resources necessary to effectively maintain and repair the systems, equipment and components found in machinery spaces of vessels; and

    (d)     commitment to continuous reduction of environmental risks.

(3)     Communication of Environmental Requirements:

The EMS must provide a means to identify, explain, and communicate all environmental requirements, and any additional best practices or industry norms which **UNIX LINE** may choose to adopt, to **UNIX LINE** employees, and other vendors, technicians or non-crewmembers engaged in the waste-stream management of **UNIX LINE** technically managed vessels. The EMS must also specify procedures for incorporating changes in operations or environmental requirements into the communication plan.

(4)     Objectives and Targets:

    (a)     The EMS shall establish specific objectives and targets for:

        (i)     achieving and maintaining compliance with all marine environmental protection requirements and the requirements of this ECP;

        (ii)     environmental performance demonstrating continuous improvement in regulated and non-regulated areas;

        (iii)     pollution prevention that emphasizes source reduction with respect to machinery space waste streams and effective management of cargo related wastes; and

9

      (iv)     sharing information with external stakeholders on environmental performance against all EMS objectives and targets.

      (b)     The EMS shall establish appropriate time frames to meet these objectives and targets. These must be documented and updated as environmental requirements change or as modifications occur in activities and structures within organizations in a manner that affects environmental performance or as a result of recommendations made by the IC or other Auditor.

(5)     Structure, Responsibility and Resources:

**UNIX LINE** will ensure that it is equipped with sufficient personnel and other resources to meet its objectives and targets. The EMS will describe in detail the procedures and steps for achieving those objectives and targets. The EMS will define the compliance roles and responsibilities of all vessel and shoreside personnel involved with the operation, maintenance, and repair of **UNIX LINE**'s technically managed vessels, and will indicate how they and other corporate personnel will be held accountable for achieving and maintaining compliance with this EMS, and other requirements of that EMS, and other marine environmental protection requirements. The EMS will also establish procedures for receiving and addressing concerns raised by **UNIX LINE** employees and others regarding environmental performance and compliance.

(6)     Operational Control:

The EMS will identify and provide for the planning and management of all of **UNIX LINE** operations and activities with a view to achieving the ECP objectives and targets. For example, vessel deck department and engine room machinery space maintenance and repair will be an important aspect in achieving and maintaining compliance and enhancing environmental performance.

(7)     Corrective and Preventive Action and Emergency Procedures:

      (a)     **UNIX LINE**, through its EMS, will establish and maintain documented procedures for preventing, detecting, investigating, promptly initiating corrective action, and reporting (both internally and externally) any occurrence that may affect the organizations ability to achieve the ECP objectives and targets.

      (b)     Such measures must address incidents that may have an effect on compliance with environmental requirements as well as on environmental performance in regulated and non-regulated areas, including requirements of this ECP, or other marine environmental protection requirements. Examples of such situations include incinerator or OWS malfunctions, overflows of fuel or slop tanks, overflow of tanks within machinery spaces, fuel oil, lube oil, saltwater line failures, operator errors and other accidental releases.

      (c)     The EMS must also establish documented procedures for mitigating any adverse impacts on the environment that may be associated with accidents or emergency situations. If the environmental violation or incident resulted from a weakness in the system, the EMS should be updated and refined to minimize the likelihood of such problems recurring in the future. The EMS should also, to the extent possible, provide for the testing and evaluation of emergency procedures.

(8)     Training, Awareness and Competence:

The EMS must establish procedures to ensure that all personnel (including vendors, technicians, and other non-crewmembers) whose job responsibilities affect the ability to achieve the ECP objectives and targets, have been trained and are capable of carrying out these responsibilities. In particular, the training should highlight means to enhance the ability of such personnel to ensure compliance with environmental requirements and voluntary undertakings, the requirements of the ECP, and other marine environmental protection requirements.

(9)     Organizational Decision-making and Planning:

The EMS must describe how these elements will be integrated into the **UNIX LINE** overall decision-making and planning, in particular, decisions on capital improvements, training programs, and vessel operations, maintenance, and repair activities.

(10)    Document Control:

The EMS must establish procedures to ensure maintenance of appropriate documentation relating to its objectives and targets and should also ensure that those records will be adequate for subsequent evaluation and improvement of the operation of the EMS. Additionally, all records will be maintained and made available to the IC, auditors and port and flag state personnel.

(11)    Continuous Evaluation and Improvement:

(a)     The EMS must include methods to perform periodic, documented and objective internal auditing of the organization's performance in achieving these objectives and targets, and on how well the ECP assists the organization in achieving those objectives and targets. This requirement is independent from the auditing requirements detailed elsewhere in this plan. The goal of these internal audits and reviews will be to allow management to continuously monitor and assess vessel systems, equipment and components, and the ability and proficiency at which vessel crew members and personnel ashore comply to the policies and procedures established by this ECP.

(b)     The EMS will identify an ongoing process for assessing when a vessel is to be taken out of service for an environmental discharge related repair, such as when a discharge is caused by leaking stern tubes, thrusters or other equipment.

(c)     The EMS will include organization charts, as appropriate, that identify shoreside and vessel individuals having environmental performance, risk reduction, and regulatory compliance responsibilities. The charts shall also specify responsibilities of Port Captains, Port Engineers, and Engineering Superintendents to report information related to environmental releases or inadequate performance of environmental pollution protection equipment, casualties causing internal spills, excessive waste development and leaking equipment with oil-to-sea interfaces.

(d)     The EMS will promote non-retaliatory practices and ensure that employees are not punished or otherwise suffer negative consequences for reporting violations of environmental laws, regulations, or policies.

(e)     The EMS will describe potential consequences for departure from specified operating policies

11

and procedures, including possible termination of employment, as well as criminal/civil/administrative penalties as a result of noncompliance.

(f)     The EMS will make employee compliance with environmental policies of the ECP, and other marine environmental protection requirements a positive factor, and failure to comply a negative factor, in all evaluations undertaken for the performance of all its employees.

(g)     The EMS will include policies against any incentive or bonus programs based on minimizing operational costs associated with the operation, maintenance and repair of machinery space systems, equipment and components to ensure that employees do not avoid such costs and thereby sacrifice environmental compliance.

(h)     The EMS will describe a confidential non-compliance reporting system that is adopted to ensure that employees may quickly and confidentially report discharges, spills, environmental incidents and other environmental performance data.

(i)     The EMS will identify all operations and activities where documented standard operating practices (SOPs) are needed to prevent potential violations or unplanned waste stream releases, with a primary emphasis on vessel engine room operations, systems, equipment and components and cargo residue management.

(j)     The EMS will identify the types of records developed and maintained in support of the ECP such as reports, audit working papers, correspondence, communications, reports from the confidential system for non-compliance reporting, and identify personnel responsible for their maintenance, and procedures for responding to inquiries and requests for release of information. The EMS shall provide a system for conducting and documenting routine, objective self-inspections by **UNIX LINE** internal auditors, supervisors, and trained staff to check for malfunctions, deterioration, and inadequate maintenance of pollution prevention equipment, worker adherence to SOPs, unusual situations, and unauthorized releases.


**F.     COURT APPOINTED MONITOR**

As part of the ECP, **UNIX LINE** agrees to pay for a Court Appointed Monitor (hereafter "Monitor") that will report to the Court and the United States during the entire period of probation. The Monitor can, at **UNIX LINE**'s option, serve concurrently in the additional capacity of Third Party Auditor (hereafter "TPA") under the terms of this ECP. Within thirty (30) days of the entry of the imposition of sentence, **UNIX LINE** will submit a list of three qualified candidates for the Monitor from which the United States will select one of the candidates. In the event that the United States does not find one of the candidates satisfactory, or if the United States does not find the work of the Monitor satisfactory, at any time they may request **UNIX LINE** to supply additional candidates. Further, if an agreement cannot be reached regarding the selection, the decision shall be left up to the Court. The Monitor must have staff with the following experience:

(a)     Expertise and competence in the regulatory programs under United States and international marine safety and environmental laws; expertise and competence to assess whether **UNIX LINE** has adequate management systems in place to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance; and demonstrated capability to evaluate **UNIX LINE**'s required effort and commitment in satisfying the requirements of this ECP and the EMS. **UNIX LINE** shall ensure that the Monitor is provided all reports and notifications as established in this plan.

(b)     The Monitor shall be assigned the following tasks and responsibilities and provide written submissions to the Court as set forth below:

-   Review the relationship between **UNIX LINE** and the IC and TPA and evaluate the adequacy of measures taken to ensure that the IC and TPA act with independence.

-   Conduct a review and submit a single comprehensive annual report to the United States which covers all of the audits conducted by the IC and TPA pursuant to this ECP. The Monitor's annual reports shall provide a summary of the findings regarding the adequacy of any audits required by this ECP and adequacy of recommendations for change, as found necessary.

-   The annual report shall also include and address any other information that the Monitor is aware of which pertains to **UNIX LINE** capabilities to meet the objectives of this ECP or any other marine environmental protection requirements.

-   All known inadequacies of the IC, the TPA or with respect to **UNIX LINE** performance whether personnel based or related to any of its vessels subject to the ECP, systems, equipment, or components shall be reported in the annual report.

-   If the Monitor receives information regarding a direct violation of any existing marine environmental protection requirement or requirement of this ECP, the Monitor must immediately report the occurrence to the United States. At any time during the probationary period the Monitor may inspect or investigate any aspect of the IC or TPA activities as they relate to the requirements of this plan or with respect to **UNIX LINE** operations, and shall be provided full access to all records, audit personnel, vessels subject to this ECP and shore side facilities as is necessary to perform its duties.

-   Provide any additional reports, in both electronic and hard copy form, to the United States and **UNIX LINE**, as requested by the Court or as appropriate and to include inadequacies in the audit process, violations of the terms and conditions of the ECP and EMS and any other findings of significant problems or deficiencies.

## G.     ENVIRONMENTAL MANAGEMENT SYSTEM MANUAL

(1)     Within six (6) months of receiving the Report of Findings on the Initial Environmental Review from the IC, **UNIX LINE** shall prepare an EMS Manual, which shall describe and document the EMS and contain any additional EMS implementation schedules as needed to ensure complete compliance in all operations and procedures. If **UNIX LINE** believes that additional time is needed to analyze available information or to gather additional information to prepare the EMS Manual, **UNIX LINE** may request that the Government grant it such additional time as needed to prepare and submit the EMS Manual, which request shall not be unreasonably denied. If necessary, the United States may grant additional time in thirty (30) day increments for completion of the EMS Manual.

(2)     **UNIX LINE** shall submit a proposed final EMS Manual to the CCM, the IC and the United States immediately upon its completion. The IC and the United States shall provide comments on the proposed EMS Manual within ninety (90) days of receipt unless additional time for review is requested in writing. **UNIX LINE** shall submit a supplement to the EMS or a written response, as appropriate, within sixty (60) days of receipt of the comments. The EMS is subject to final approval from the United States, which approval shall not be unreasonably withheld.

(3)     All elements of the EMS Manual shall be fully implemented no later than nine (9) months following final approval by the United States. Upon receipt of final approval, **UNIX LINE** shall immediately commence implementation of the EMS in accordance with the schedule contained in the EMS Manual. **UNIX LINE** shall submit reports to the designated representative of the Coast Guard, United States Attorney's Office for the Northern District of California, and the Environmental Crimes Section, United States Department of Justice beginning no later than one hundred twenty (120) days following the publication of the Report of Findings by the IC, regarding the status of the development and implementation of the EMS and the results of the Review and evaluation of **UNIX LINE** operations or audits conducted pursuant to the EMS. These reports shall be made on an annual basis.

**H.     FINAL EMS/ECP COMPLIANCE AUDIT**

(1)     Beginning no later than twelve (12) months prior to the end of probation, UNIX LINE shall arrange for, fund and complete a Final EMS/ECP Compliance Audit of the remaining 25% of UNIX LINE Covered Vessels. Two (2) of the audits shall be conduct while the vessel is underway and operating on a voyage of short duration (3-4 days or less). The final audits are to be conducted by the TPA, to verify compliance with applicable environmental laws and regulations and the requirements of this EMS and ECP. UNIX LINE and the TPA shall coordinate the underway examinations to accommodate, as much as practicable, the vessels' operations and schedules. The TPA will have full access to UNIX LINE facilities, records, employees and officers at all times. During this final audit phase UNIX LINE shall immediately advise the TPA of any issue that comes to its attention that adversely impacts UNIX LINE's compliance with all applicable laws and regulations and the EMS/ECP. ALL TPA AUDITS MUST BE COMPLETED AND REPORTED TO THE UNITED STATES AT LEAST THREE MONTHS PRIOR TO THE EXPIRATION OF PROBATION.

(2)     The TPA will be certified by the American National Standards Institute -Registration Accreditation Board or will have compatible credentials and experience in performing EMS/ECP audits. Selection of the TPA is subject to the same conditions identified in Section C above regarding selection of the IC. Selection of the TPA will be approved by the United States. The United States will notify **UNIX LINE** in writing of its approval or disapproval as expeditiously as possible.

(3)     The Final EMS/ECP Compliance Audits shall be conducted, as much as is practicable under the circumstances, in accordance with the principles set forth in ISO 9000 and ISO 14011, using ISO 14012 as supplemental guidance. The TPA shall assess conformance with the elements covered in the Initial Environmental Review, with all additional requirements presented in the EMS and with the additional requirements of this plan. Designated United States representatives may participate in the audits as observers at Government expense. **UNIX LINE** shall make timely notification to the United States regarding audit scheduling in order to make arrangements for observers to be present.

14

(4)     The TPA shall deliver each vessel's and facility's audit report to the appropriate company official upon completion. In addition, the TPA will deliver an Audit Report to the U.S. Probation Office, designated representative of the Coast Guard, and Environmental Crimes Section, United States Department of Justice within thirty (30) days after the completion of each audit. If the TPA believes that additional time is needed to analyze available information or to gather additional information, **UNIX LINE** may request that the Government grant the TPA such additional time as needed to prepare and submit the Audit Report. If necessary, the Government may grant additional time in thirty (30) day increments for completion of the Audit Report.

(5)     The Final EMS/ECP Compliance Audit Reports shall present the Audit Findings and shall, at a minimum, contain the following information:

   (a)     Audit scope, including the time period covered by the audit;

   (b)     The date(s) the on-site portion of the audit was conducted;

   (c)     Identification of the audit team members;

   (d)     Identification of the company representatives and regulatory personnel observing the audit;

   (e)     The distribution list for the Final EMS/ECP Compliance Audit Report;

   (f)     A summary of the audit process, including any obstacles encountered;

   (g)     Detailed Audit Findings, including the basis for each finding and the Area of Concern identified;

   (h)     Identification of any Audit Findings corrected or Areas of Concern addressed during the audit, and a description of the corrective measures and when they were implemented; and

   (i)     Certification by the TPA that the Final EMS/ECP Compliance Audit was conducted in accordance with this document and general audit principles.

(6)     Within sixty (60) days from completion of the Final EMS/ECP Compliance Audit of a particular facility or vessel, **UNIX LINE** shall develop and submit to the United States, for review and comment, an Action Plan for expeditiously bringing **UNIX LINE** into full conformance with all applicable laws and regulations and the EMS/ECP Manual. The Action Plan shall include the result of any root cause analysis, specific deliverables, responsibility assignments, and an implementation schedule. **UNIX LINE** may request that the United States permit a brief extension of the time limit stated above on a case by case basis. Such permission shall not be unreasonably withheld.

(7)     The Action Plan shall be reviewed by the United States which shall provide written comments within thirty (30) days of receipt. After making any necessary modifications to the Action Plan based on the comments, **UNIX LINE** shall implement the Action Plan in accordance with the schedules set forth therein. Within thirty (30) days after all items in the Action Plan have been completed, **UNIX LINE** shall submit a written Action Plan Completion Certification to the United States.

**I.      NON-COMPLIANCE**

(1)     This EMS/ECP does not in any way release **UNIX LINE** from complying with any applicable international conventions and treaties, State or Federal statutes and/or regulations, the ISM Code, or other international maritime conventions or treaties and does not limit imposition of any sanctions, penalties, or any other actions, available under those international conventions and treaties, State or

Federal statutes and regulations, the ISM Code, or other international maritime safety conventions or treaties.

(2)     The EMS/ECP shall be a special condition of probation. Failure to comply with any part of this EMS/ECP (including but not limited to refusal to pay valid and reasonable charges for the IC or TPA and failure to provide the IC or TPA access to vessels, facilities, personnel or documents) may be a violation of probation and may be grounds for the revocation or modification of **UNIX LINE**'s probation. Should the United States or the U.S. Probation Office seek to revoke or modify **UNIX LINE**'s probation based on **UNIX LINE**'s refusal to pay valid and reasonable charges for the IC or TPA and/or its failure to provide the IC or TPA access to vessels, facilities, personnel, or documents, and/or as the result of any disagreement regarding any of the provisions of this EMS/ECP, **UNIX LINE** shall have the right to contest the reasonableness of such revocation before the appropriate U.S. District Court.

**J.     CCM/VESSEL MASTER RESPONSIBILITIES**

(1)     The Master of any of **UNIX LINE** vessel covered under this ECP, with the assistance of the CCM, shall ensure that timely reports are made to the United States of any non-compliant condition of any **UNIX LINE** vessel covered under the ECP. **UNIX LINE** shall establish that enforcement of and employee compliance with the EMS/ECP, ISM Code, MARPOL, and all applicable State and Federal safety and environmental statutes and regulations is an important positive factor and that failure to comply with such policies, regulations, and laws will be a negative factor in all appropriate personnel evaluations.

**K.     BOARD OF DIRECTORS**

**UNIX LINE** shall ensure that at least yearly its Board of Directors or equivalent governing structure receive and review reports from the CCM and any applicable report from the IC concerning the implementation of this EMS/ECP, including environmental compliance, EMS implementation, and manager, officer, and crew training. Copies of those portions of the meeting agendas and internal company reports concerning these items shall be included in the reports to the United States.

**L.     TRAINING REQUIREMENTS**

(1)     The CCM will be responsible for developing training programs to educate and train **UNIX LINE** vessel and shoreside employees associated with the technical management of its vessels subject to this ECP. The CCM may name a Corporate Training Officer to ensure that the requirements of this section are met.

(2)     Training shall occur annually for all employees and be performed by qualified internal or external instructors at a training facility, or at **UNIX LINE**'s offices, before an employee assumes his or her duties. The training shall consist of pertinent sections of this ECP, the EMS, and existing marine environmental protection requirements. The training shall include shipboard-related technical and practical information associated with pollution prevention and the operation, maintenance and repair of pollution prevention equipment and systems, and be appropriate for the work responsibilities and department in which an employee works. The training must include discussion of the consequences to **UNIX LINE** and its employees for failure to comply with the requirements of this ECP, EMS, and existing marine environmental protection requirements.

16

(3)     Where possible, a basic initial training program shall be provided to vessel employees currently onboard vessels subject to the ECP in an effort to promptly mitigate pollution risk and ensure environmental protection. However, such employees must receive the shore side training prior to returning to a vessel subject to the ECP on a new contract.

(4)     Additionally, the training shall include instruction regarding:

     (a)     Corporate environmental compliance structure, including the CCM and contact information.

     (b)     Comprehensive overview of this ECP, the EMS, and other marine environmental protection requirements.

     (c)     The reporting system used to report non-compliance.

     (d)     Sanctions and consequences for violations such as remedial training, suspension, termination, and civil and criminal liability.

     (e)     Pollution prevention and minimization programs specifically relating to steward, deck, and engine department procedures and operations.

     (f)     All requirements set forth in the Engineering section of this ECP.

     (g)     Position-specific training in the operation, maintenance and repair of oily water separators, incinerators, oil content discharge monitoring equipment, and other pollution prevention equipment.

     (h)     Procedures for solid and hazardous waste segregation and storage, disposal, and reporting of releases.

     (i)     All other shipboard environmental protection related procedures examined and described in the required initial review.

(5)     All new crewmembers hired to work on **UNIX LINE** vessels subject to the ECP shall receive training within thirty (30) days of beginning to work on board such vessel. **UNIX LINE** shall maintain documentation onboard each of its technically managed vessels subject to the ECP verifying that all officers and crewmembers working on the vessel have received the required training. Such documentation shall be made available to the IC and the United States upon request.

(6)     The Chief Engineer onboard each of **UNIX LINE** technically managed vessels subject to this ECP shall prepare independent written verification that all engine room crew members have received the training required by this EMS/ECP. All engine room crewmembers shall sign and date a statement acknowledging completion of the training. This written verification, together with the signed acknowledgment, shall be completed annually and maintained in the engine control room of each vessel.

**M.     ENGINEERING REQUIREMENTS**

(1)     Unless otherwise stated, all of the requirements set forth below, if not in contravention of any Classification Society, Treaty or other Flag State requirement, shall be implemented on the vessels covered under this ECP as soon as practicable, as determined by the CCM and not later than one year from the date of sentencing.

(2)     Bilge Main Cross-Connections:

      (a)     **UNIX LINE** shall immediately notify all of its vessels regarding the prohibition against non-emergency use of cross-connections from engine room bilge mains to the suction piping of larger pumps which may be referred to as the "fire and general service pump" or "fire, bilge and ballast" pump. The message shall state that the usage of these crossovers is similar to bypassing the OWS equipment and strictly prohibited.

      (b)     The deck plates above or near the locations of these cross connections and the valves' bodies and associated hand wheels shall be painted international orange. A brightly colored sign with three inch letters shall be permanently fixed nearby reading, "Bilge System Piping Crossover-Emergency Use Only."

      (c)     To prevent unauthorized usage, Chief Engineers shall place numbered seals on these valves.

      (d)     The seal numbers shall be tracked in a seal number logbook and explanations shall be given any time a crossover to the bilge main is opened. Seals shall be used in other areas of the machinery space. The Master of the vessel shall retain the replacement seals in the vessel's safe. The Master will keep an additional log documenting when seals are replaced and their respective numbers. The CCM will be responsible for ensuring fleet wide that no duplication of seal numbers occur and will have a master tracking document indicating which series were supplied to each vessel.

      (e)     If the valves are remotely operated from the engine control room, the control must also be disabled and notice made near the associated push buttons or switches. They shall also be sealed.

      (f)     All other bilge suction valves not connected to the bilge main, including independent emergency suctions to the vessel's engine room bilges like those that may be connected to sea water circulating pumps, will be painted brightly and labeled similarly "Emergency Bilge Suction -Emergency Use Only," Their valve wheels will also have a numbered and logged seal capable of breakaway during emergency.  Seal numbers shall be kept in the Chief Engineer's official seal log book and explanations given for breakage or replacement.

(3)     Blank Flanges:

      (a)     To prevent unauthorized connections within the engine room and machinery spaces of **UNIX LINE** vessels, every blank flange associated with any piping leading overboard, on systems such as bilge, sludge, salt water service, main engine raw water cooling or other systems, shall be permanently secured, removed or fitted with numbered seals through the flange bolts to

prevent unauthorized connections and discharges. The seals used shall be numbered and records kept in the previously mentioned log.

(b)     The blank flange securing the bilge and sludge transfer system and the shore connection discharge valve at the discharge stations shall also require a numbered seal that will be maintained. Seal numbers shall be kept in the Chief Engineer's official seal log book.

(4)     Tank Sounding Log:

The CCM shall ensure the immediate usage of Tank Sounding Log Books on all vessels. Engine room crew members shall be required to sound all waste, sludge, and bilge tanks associated with bilge water, oil wastes, or sludge during each watch for vessels having a manned engine room or twice daily for those having an unmanned engine room. The Tank Sounding Log shall be initialed by the crewmember that obtained the reading. The Tank Soundings Log shall be maintained in the engine control room and made available during all inspections and audits required by this ECP.

(5)     Oil-to-Sea Interfaces:

(a)     **UNIX LINE** agrees to immediately develop for each vessel a log book relating to equipment having oil-to-sea interfaces. Such systems may be oil lubricated stem lubes, bow or stem thrusters, stabilizers, hydraulically operated controllable pitch propellers, and similar equipment whereby the leakage of a sealing component may cause a loss of operating medium into the surrounding waters of the vessel. Any replenishment of oil into the head tanks, operating systems reservoirs or other receivers associated with this equipment shall be logged regardless of quantity. Ingress of water into these systems must also be logged.

(b)     When known, an explanation of the loss shall be provided, along with dates and time and signature. Routine stem tube lube oil loss must be logged and reported to the CCM immediately on each occasion. **UNIX LINE** agrees to remove from employment any Chief Engineer who fails to report these conditions.

(6)     Record Keeping:

All Soundings and Logs required by this section shall be maintained onboard the vessel for a period of three years from the date of the final entry.

## N.     DOCUMENTATION AVAILABLE FOR INSPECTION

The CCM shall ensure that all documentation required by this EMS/ECP is maintained and available for inspection by the IC, TPA, and the United States. The Master of each **UNIX LINE** vessel under this ECP, shall maintain on board the vessel, all records required by International conventions and treaties including SOLAS, the ISM Code, and MARPOL and applicable State and Federal statutes and regulations and any additional documents required under this EMS/ECP, such as crew training records, and will make these records available to the IC, TPA, and the United States upon request. A summary of this information and any explanation, where appropriate, shall be included in the reports to be submitted to the United States by the IC and TPA.

19

O.      **CHANGES IN OWNERSHIP/MANAGEMENT**

The parties recognize that during the term of probation, the number and identity of vessels technically managed by **UNIX LINE** may increase or decrease. Any vessel, the technical management of which is assumed by **UNIX LINE,** and which calls or may call at ports in the United States, shall be subject to the terms and conditions of this EMS/ECP. Any vessel removed from the technical management by **UNIX LINE**, or which no longer calls or is expected to call at a port in the United States, shall be excluded from the scope of the EMS/ECP. **UNIX LINE** agrees that it will immediately (but in no event later than 21 days following a change) notify the United States of any change in name, flag of registry, recognized organization, ownership or class society of any such **UNIX LINE** vessels, technical management of which is assumed by **UNIX LINE**. **UNIX LINE** agrees that this EMS/ECP shall remain in effect for all of the aforesaid vessels regardless of changes in the vessels' flag of registry, recognized organizations, name, or class society, so long as the vessels are technically managed by **UNIX LINE**. **UNIX LINE** shall notify the United States before any vessel is released from the requirements of the EMS/ECP due to a change in technical management or if such vessels cease calling on ports or places in the United States. UNIX LINE SHALL NOT UNDERTAKE ANY EFFORTS TO CEASE TECHNICAL MANAGEMENT OF ANY VESSEL FOR THE PURPOSE OF EVADING COMPLIANCE WITH, OR THE REQUIREMENTS OF, THIS ECP.

P.      **SELF-ENFORCEMENT**

**UNIX LINE** further agrees that it will undertake and implement the necessary procedures to ensure that this EMS/ECP is diligently complied with by the officers and crew of each of **UNIX LINE's** technically managed vessels subject to this ECP, as well as by all shore side employees, managers and other employees of **UNIX LINE** subsidiaries, and agents of **UNIX LINE** engaged wholly or partially in the technical management of the aforesaid seagoing vessels subject to this ECP or contracted to do the same, on the date of sentencing or at any time during the period of probation.

Q.      **REVISIONS/MODIFICATIONS**

The requirements of this EMS/ECP, including the dates and time periods mentioned herein, shall be strictly complied with. Should **UNIX LINE** be unable to comply with any of the deadlines, **UNIX LINE** shall immediately notify the United States in writing of the reason(s) for non-compliance, and propose a revised timetable. The United States shall then determine as to whether the revised timetable should be accepted.

R.      **REPORTS**

All reports, documents and correspondence required under this EMS/ECP to be sent to the United States shall be sent to the following offices:

   (a)      U.S. Attorney's Office
            Northern District of California
            Attn: Katherine Lloyd-Lovett
            1301 Clay Street, Suite 340S
            Oakland, CA 94612

   (b)      U.S. Department of Justice

20

Environmental Crimes Section
Attn: Kenneth Nelson
4 Constitution Square
150 M Street, N. E.
Suite 4.130
Washington, D. C.  20002

(c) U.S. Coast Guard Investigative Services
Pacific Region, Bldg. 18, 2nd Floor
Coast Guard Island
Alameda, CA 94501-5100

(d) U.S. Probation Department
Northern District of California
1301 Clay Street, Suite 220S
Oakland, CA 94612